Filed 10/13/15  In re K.Z. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re K.Z. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067785 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3465ABCD) |
| v. | |
| N.Z., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Lisa Maldonado, Senior Deputy County Counsel, for Plaintiff and Respondent.

N.Z. (Mother) appeals from juvenile court orders terminating parental rights to siblings K.Z., L.Z., G.Z. and N.Z. and choosing adoption as the appropriate permanent plan under Welfare and Institutions Code section 366.26.[1] Mother contends she established both prongs of the beneficial-relationship exception to adoption preference (§ 366.26, subd. (c)(1)(B)(i)), requiring that the order be reversed and the matter remanded for selection of a different permanent plan. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*Mother's Pre-Family Court Services History and Agency's Section 300 Petitions*

In October 2011, the superior court issued a protective custody warrant for siblings K.Z., L.Z., G.Z., and N.Z., who were then respectively 9, 7, 4 and 3 years old, after they had been exposed to domestic violence between mother and W.Z. (father), the presumed father of K.Z., L.Z. and N.Z.[2] The protective services worker reported that there had been three prior incidents of father choking mother, as well as an incident in late August 2011 in which father attacked mother in front of the children, grabbing mother by the hair and dragging her down stairs then choking her by the neck. The worker reported that law enforcement had been called out 10 times in the past year at the family's prior address. Mother told the protective services worker she had given up trying to leave father because she felt "powerless" against him, and he had followed her

---

[1] Statutory references are to the Welfare and Institutions Code. Mother and N.Z. share the same first name.

[2] The record refers to G.Z.'s alleged father as Pedro P. It also reflects that according to mother, father gave G.Z. his last name.

2

and broke into her house. The worker reported that each parent had a restraining order against the other. Mother was admitted to a shelter and had enrolled the children at school, but K.Z., who took medications for ADHD and aggression, had been expelled from his original school.

On October 11, 2011, the San Diego County Health and Human Services Agency (Agency) filed juvenile dependency petitions on the children's behalf on grounds the parents had failed to protect them based on the late August domestic violence incident and their earlier violent confrontations (§ 300, subd. (b)(1)). The juvenile court detained the children with mother and ordered supervised and liberal visitation with father, but no contact between mother and father.

In a jurisdiction and disposition report for a November 2011 hearing, a social worker observed that the children had had long exposure to a multitude of abusive behaviors including domestic violence and neglect, and lived an "extremely transient lifestyle" as evidenced by school records showing K.Z. had changed schools 11 times between 2008 and 2011. K.Z. had an individualized education plan identifying his disability as "other health impairment and speech or language impairment" (some capitalization omitted) but neither he nor L.Z. were attending school. The social worker characterized the parents' relationship as "very volatile [and] unhealthy" with problems that had impacted the children's wellbeing; mother was unable to maintain herself away from father and had always returned to his home, and father denied all of the domestic violence. Mother appeared tired and overwhelmed and did not know what to do; there was a sense of hypervigilance by all of the children consistent with children exposed to

3

domestic violence, and mother seemed to struggle with them. Mother appeared close to "giving up." The social worker concluded the parents had seriously compromised the children's physical and emotional welfare, and they could not be safely maintained with mother without the juvenile court's intervention, as father was unable to follow family court or juvenile court orders. She recommended the children continue to be placed with mother and that father be provided reunification services, with a temporary restraining order in place.

In an addendum report, the social worker reported that mother and the children had been living with friends but had to move out due to problems with the adults in the home. Mother and the children then had to leave another apartment where they were staying with another friend, and mother contemplated returning to the previous home, but realized it was "probably not the best place" after the social worker questioned her. Mother ended up at a sober living facility with a friend for a week or so, and was currently looking for an apartment. L.Z.'s school had reported that she had only been at school a couple of days, and had been late two of the three days she had been enrolled. As of December 2011, mother was unable to find stable housing and was still staying at a sober living home with a friend. She had missed a scheduled appointment with a facility that would have allowed her to stay for up to 18 months.

*K.Z.'s Detention in Out-of-Home Care/Disposition Hearing*

In January 2012, the social worker in an addendum reported that Agency was concerned about K.Z. as he had been admitted to the hospital due to a ruptured appendix. On admittance, K.Z. was obviously malnourished and he exhibited hyperactivity as well

4

as other behavioral issues. Mother visited K.Z. twice in the hospital and had telephone contact with him, but did not visit him again until April 2012, claiming she did not have anyone to watch the other children. She reported to the social worker that she was living in a sober living facility with her boyfriend and the children all in one bedroom; she stated she was not capable of caring for K.Z. and agreed he should be living in out-of-home care. When social workers visited L.Z. at school it appeared she had not showered in a few days, her clothes were stained and dirty, and her hair was oily, unkempt and contained lice. She and the other children had an ongoing head lice problem. L.Z. reported that mother's boyfriend was scary because he yelled at them and slapped them on their hand when the siblings fought. Agency had provided mother with numerous resources and opportunities to find shelter and transitional housing, but she had failed to follow up with appointments and phone calls. Agency recommended K.Z. be placed in out-of-home care so he would receive proper attention to his medical and behavioral needs in a stable and structured environment, but that the other children remain with mother.

The juvenile court made true findings on the original section 300 petition and ordered K.Z. to be detained at Polinsky Children's Center (Polinsky) with visitation by mother on the condition she visit him without the other siblings. It set a contested disposition hearing for February 2012.

As of February 2012, Agency reported that K.Z. was doing well at Polinsky and gaining weight, though he had behavior issues at school with one suspension, some unexcused absences and late days. Though in late January 2012 mother had reported

5

getting into a shelter, days later she claimed they never returned her call so she was still living in the sober living facility. A county homeless family services coordinator advised Agency that mother qualified for temporary homeless assistance, welfare to work and child care, and would be receiving approximately $1300 in monthly assistance; he did not understand why the family was homeless. Mother claimed she did not do the welfare to work program because of her problems with father. Social workers assisted mother in obtaining vouchers for a hotel, and observed the children were running around and fighting, and had lice eggs in their hair. Mother eventually reported that a friend offered to rent her rooms for her and the children. Later that month, Agency reported that mother had still not resolved the children's lice problem; she had a flat affect and claimed she had "just had so much going on" and did not know what to do. Agency expressed "constant concern" that mother failed to follow up with meeting the children's basic needs, including the lice issue, doctor appointments, and visitation with father. Mother did not remember to attend visits even though they were weekly at the same time and location. Agency had additional concerns about the children's wellbeing as they had been observed twice in the last two weeks running away from mother including near the street where they could be injured. At the February 21, 2012 contested disposition hearing, the court ordered mother to undergo a psychological evaluation, ordered no contact between the children and mother's boyfriend, Michael C., and set the matter for six and 12-month review hearings.

   As of August 2012, Agency reported it was not in K.Z.'s interest to be returned to mother, who was not equipped to meet his need for structure and supervision and was

only making slow progress with her services and in dealing with the other three "active and defiant" children. She was incapable of handling all of the children during her weekly visits and required assistance of staff at the Herrick Center where K.Z. was staying. Agency described the case as "chaotic" since its inception, with mother's frequent moves, the children having unstable schooling and constant head lice as well as aggressive behaviors. It described mother as tending to "play the victim" to excuse her inability to cure the head lice problem and not making the children available for father's visits. It recommended mother receive six more months of reunification services with K.Z., and six more months of family maintenance services with L.Z., G.Z. and N.Z.

The court continued the six-month review hearing several times, and it eventually set the matter for a combined contested six and 12-month review hearing in December 2012. Before that hearing, mother was found by Agency to be continuously violating the no-contact order with Michael C., as he was living at mother's home with the children. Mother acknowledged the no-contact order but stated Michael C. was a "good man" and the children reported that he was nice. Agency eventually moved to modify and remove the order and the court allowed Michael C. supervised visits.

*Section 387 Juvenile Dependency Petitions on Behalf of L.Z., G.Z. and N.Z.*

In March 2013, Agency filed section 387 dependency petitions on behalf of L.Z., G.Z. and N.Z., then respectively 8, 5 and 4 years old, alleging that mother was no longer able to provide adequate care and supervision of the children in that she had been involved in a domestic violence incident with Michael C. in their home and allowed the children to have contact with him in violation of the court's orders. In a detention report,

Agency stated that mother did not have the mental capacity to protect herself or her children from domestic violence. The court ordered the children detained at Polinsky with services to mother, and by March 22, 2013, they were placed together in a foster home. The court ordered Court Appointed Special Advocates (CASA's) for the children.

As of mid-April 2013, mother was homeless and living with friends, and still talking with Michael C. with whom she wanted to continue a romantic relationship. Agency expressed concern that she would expose the children to further domestic violence if they were returned to her.

Thereafter, the juvenile court made true findings on the section 387 petitions for L.Z., G.Z. and N.Z., declared them dependents placed in foster care, and set six and 12-month review hearings.

*Termination of Mother's Reunification Services as to K.Z.*

At K.Z.'s July 2013 18-month permanency review hearing, the juvenile court terminated mother's reunification services and placed K.Z. with father at St. Vincent De-Paul shelter with conditions. Agency had previously reported that in February 2013, it received a referral noting mother did not seek appropriate medical attention when K.Z. had received a burn at her house. Mother admitted K.Z. was not supposed to be in her home for visits, which were to be off-grounds in the community. Agency observed mother had continuously ignored the court's no-contact orders, but finally broke her relationship with Michael C. two months after the other three children were removed from her care. Mother had been in a shelter since May 2013. In June 2013, mother would not confirm or deny being in a relationship with Michael C., but admitted he was

8

paying for her cell phone. She claimed to have enrolled in parenting classes but did not provide that information to the social worker, she had not participated in domestic violence classes, and she did not take advantage of opportunities to obtain employment, saying that cleaning offices or hotels was "hard work" and she did not have experience. She participated in weekly individual therapy and visits with the children once a week. Mother had been working with Families Forward for in-home maintenance services for the younger children and reunification services for K.Z., but the representative reported that they had a difficult time making regular contact with her, and when they did meet with her, her focus was on father's extended time and the fact she was given limited time with the children. She completed 12 weeks of conjoint therapy with K.Z., who expressed disappointment when she missed scheduled visits and when he learned his siblings were removed from her home. Mother had been depressed and unmotivated to do services, instead focusing on hiding the fact she was seeing Michael C. and telling the children to lie about it. She was "not very proactive or consistent with visits with [K.Z.]" She had difficulty seeing how Michael C.'s controlling behaviors were part of the cycle of domestic violence, and she was not in a place to care for or emotionally provide for K.Z. and meet his needs.

*Six-Month Review Report for L.Z., G.Z. and N.Z.*

As of October 2013, Agency reported that it would be detrimental to return any of the children to either parent. L.Z. and G.Z. were both in therapy for their emotional issues and trauma from witnessing the domestic violence incidents. Both had made progress, but L.Z. expressed anxiety about having father around mother, and G.Z. was

9

fearful his father would choke mother again. N.Z. was not in therapy; she struggled with her separation from mother and stated she wanted to go home with her. Mother was participating in weekly therapy and had completed 30 domestic violence classes; her confidence and self-efficacy was building and she was making progress in taking responsibility for her actions. She had not had contact with Michael C. for four months. She completed two parenting classes and was learning to pay attention to the children's cues, as well as use appropriate discipline techniques. Mother was visiting the children consistently twice a week, usually at a park, with few missed visits. She brought appropriate snacks, met the children's verbal and nonverbal cues, provided emotional support and affection, and took the time to interact with them as well as read books, help with their homework, and encourage them to do well. At that time, the children responded well to mother and often cried on leaving; they stated they enjoyed the visits and wished to live with her. Despite this, Agency still had concerns about mother's ability to adequately supervise the children, and observed she still needed to get a job and strengthen her ability to stand up for herself.

The CASA for L.Z., G.Z. and N.Z. observed five visits with mother, who was late twice and cancelled a visit claiming a medical emergency, but later called the children from Mexico telling them she was at a birthday party. According to the CASA, mother had one supervised weekly visit with the children, and called the children two or three times per week. Mother and the children were happy to see each other, but sometimes she became overwhelmed and was able to focus on only one child at a time, leaving her unaware of the other children's whereabouts. The children wanted to visit mother as

often as they saw their father.  The CASA reported that the children were doing well and in good general health.  She attributed some of their success to the stability offered by the foster parents, where they were thriving, and recommended the children remain in this placement.  She recommended mother continue to have supervised weekly visits.

*K.Z.'s Hospitalization for Suicidal Ideation/K.Z.'s Section 388 Petition/Agency's Section 387 Petition as to K.Z.*

In November 2013, Agency reported that K.Z. had been hospitalized in mid-November for suicidal ideation and an attempt to hang himself.  It observed K.Z. had continually expressed his concern about being in the middle of his parents "like a ping-pong ball" and that if he had to choose who to live with, he would hurt the other parent.  Father's behavior contributed to the decline in K.Z.'s mental health, and K.Z. had become more unfocused and impulsive, with his suicide attempt and lack of behavioral control.  Agency learned that the previous month father had paid mother's cell phone bill, encouraging her dependence on him.  Mother and father participated in a conjoint therapy session, and they made a brief effort to salvage their marriage.  During a late November 2013 visit, the younger children's CASA observed they had reverted to their very wild impulsive behavior such as running, hitting, fighting and choking.  She was "extremely alarm[ed]" by the visit, which was "absolutely chaotic with all family members moving frenetically the entire time."

In early December, K.Z.'s counsel moved under section 388 to change the juvenile court order placing K.Z. with father, and instead have him placed in a licensed foster home.  Agency followed with a section 387 petition as to K.Z., alleging that father

11

allowed K.Z. to be supervised by an unrelated adult who physically disciplined K.Z. on multiple occasions causing a bruise, and that father was no longer able to provide K.Z. adequate care and supervision. The juvenile court ordered K.Z. detained at Polinsky, and set the matter for a jurisdiction/disposition hearing.

As of January 2014, mother was having unsupervised visits with K.Z. and two overnights per week. She had missed several visits, at times because she was confused about the no-contact order and other times because she wanted to avoid conflict with father. After K.Z. was removed from father's care, she visited him three times a week and had at least one overnight per week. K.Z. enjoyed the visits and wanted them to continue, but he told the reporting social worker that he did not want to choose between his father and mother; he wanted the court to decide. K.Z.'s CASA reported that though mother had reportedly been making progress with her services, the CASA did not feel mother was able to provide a safe, stable living situation for him, and felt it was not appropriate to place K.Z. with her. The CASA agreed with Agency's recommendation to continue daytime unsupervised visits and twice weekly overnight visits.

At the end of January 2014, K.Z. was placed in a confidential foster home. Agency reported that as of that time, mother was still living in a homeless shelter that did not accept children, and had an intake appointment with another homeless program but did not attend, claiming to be sick. Agency was not able to place K.Z. with her as she did not have suitable housing that allowed children. Additionally, mother felt K.Z. still needed help with his behaviors, especially regulating his emotions and impulses, before returning to her care. In late January 2014, the court conducted status/special hearings as

to all of the children with mother present. K.Z.'s counsel advised the court she might ask it to set a section 366.26 hearing as to K.Z.

In early February 2014, the juvenile court appointed K.Z.'s CASA as his educational representative.[3]  In late February, Agency reported that Mother had been visiting K.Z. consistently but could not take advantage of her overnight visits because her current housing situation did not allow children.  K.Z. enjoyed and looked forward to the visits.  He was adapting well to his new foster home, was helping with chores there, and doing well in school, without any incidents since November.  Agency recommended another planned permanent placement for K.Z.; the plan was to place K.Z. with mother when she got housing.

*K.Z.'s Contested Adjudication and Disposition Hearing*

In March 2014, the court sustained and made true findings on Agency's section 387 petition, and took K.Z.'s section 388 hearing off calendar.  K.Z.'s counsel asked the court to set the matter for a section 366.26 hearing, to which Agency did not object. Social worker Amy Mezger testified that while Agency's recommendation in late February 2014 was that another planned permanent living arrangement was appropriate for K.Z. because he was having overnights and unsupervised visits with mother, Agency presently did not recommend that he be placed with mother, and it recommended mother be provided no additional services.  Mezger testified there was no guarantee mother was

---

3    That same month, the juvenile court also granted the foster parents' request to designate them as the de facto parents of L.Z., G.Z. and N.Z.  It set a 12-month review hearing for those children in April 2014.

13

going to reunify with K.Z. in the next four months.  The juvenile court set K.Z.'s matter for a July 2014 section 366.26 hearing.

*April 2014 Status Report for L.Z., G.Z. and N.Z.'s 12-Month Review Hearing*

By April 2014, mother had left the shelter in which she was living as she was unable to have the children there with her, but she was unable to find another shelter that accepted children.  She claimed to be sharing a three bedroom home with another mother, but did not provide a physical address.  She was working about 20 hours a week and taking classes and as a result missed most of her weekday visits with the children, causing them to be upset and disappointed, so those visits were cancelled.  Mother visited the children and K.Z. regularly on Saturdays, but the CASA observed that she had trouble keeping track of the children and redirecting K.Z., describing one visit as "chaotic," with the children fighting with sharp sticks and running off.  Agency noted concern that mother was unable to provide adequate food during the visits, as her food stamps were decreased, and the foster mother reported the children were coming home hungry.  Mother was inconsistent in attending her high conflict co-parenting classes, and she stated she did not want to continue individual therapy.  The therapist agreed that mother had completed her goals but felt she would benefit from continued therapy.

Mother had also twice taken the children to see Michael C. in March 2014, at a park near his residence, and also at his house where they watched movies and "hung out." She claimed the children wanted to see him but took responsibility for it, admitting she did not make a good choice.  Agency reported that this situation compelled it to file a section 388 petition to change visits back to supervised visits, because while mother was

14

making progress, she continued to struggle with making appropriate decisions for her children and putting their needs first as evidenced by her allowing them to see Michael C. It stated mother was not an appropriate placement for the children. Agency observed that mother cared for her children to the best of her ability but "she was not able to demonstrate her parental role" and put the children's needs in front of her own. It was concerned mother was falling back into the cycle of violence and would be unable to protect the children, and she put them in a compromising situation where the children felt the need to keep information from the social worker, their foster mother, and therapist. Agency recommended six additional months of services.

*12-month Permanency Report and Hearing for L.Z., G.Z. and N.Z.*

For L.Z., G.Z. and N.Z.'s 12-month permanency hearing originally set in May 2014, Agency recommended that mother's reunification services be terminated but that she have supervised visits. Mother had informed Agency that she was still seeing Michael C. and had a difficult time staying away from him. When asked if she wanted her children back, mother said she loved them and wanted them back but, "Sometimes I don't know if I can care for them. I don't have anything to give them right now." Mother had not attended her last three high conflict parenting classes and had minimal participation in those she attended; the educator was unsure if she understood the material concepts. Mother had not been to her group domestic violence classes for about three weekends, and she was late for her therapy with K.Z. The therapist reported that K.Z. had expressed that he did not trust his mother to care for his needs, and mother said she was scared to have the children back because she did not know if she could care for them.

15

Agency observed mother exhibited an inability to protect the children and keep them safe; it did not feel that continued services would be beneficial to the children and she would not be able to complete the case plan objectives to change their behavior and safely parent the children. The children's CASA's agreed with this recommendation, observing that despite her classes and therapy, mother continued to place the children at risk by continuing her relationship with Michael C. The juvenile court eventually continued the 12-month review hearing to July 2014.

At the July 2014 12-month review hearing, the juvenile court granted Agency's section 388 petition, terminated mother and father's reunification services for L.Z., G.Z. and N.Z., and set their matter for a section 366.26 hearing. Agency asked that K.Z.'s matter be continued to coincide with his siblings' section 366.26 hearings.

*K.Z.'s July 2014 CASA Report*

In July 2014, K.Z.'s CASA reported that since mother's visitation status changed in April 2014, she had not visited K.Z., but saw him only at weekly joint family therapy sessions. K.Z.'s foster mother did not notice any impact on K.Z.'s behavior related to the lack of one-on-one visits with mother; she reported he seemed indifferent about whether he saw her. The CASA observed that Agency had determined that K.Z. was generally adoptable with 11 possible homes for him in San Diego County. She felt K.Z. was thriving in his foster home because he was living and going to school in safe, supporting environments, and interacting with people who set reasonable behavior standards for him and positively affirmed his ability to meet his goals. Though the foster home was meant

16

to be temporary, K.Z.'s CASA recommended he remain placed there pending the search for an adoptive home.

*Section 366.26 Assessment Reports and Mother's Visitation with K.Z., L.Z., G.Z. and N.Z. from August 2014 to January 2015*

In October 2014, Agency filed an assessment report for the children's section 366.26 hearing, which was originally set for late October 2014, but was continued to January 2015. K.Z., who in October 2014 was 12 years old, had been placed in his foster home since late January 2014. L.Z., G.Z. and N.Z., then respectively 10, 7 and 6 years old, had been in their new foster home since late May 2014, having been moved from placement with their previous foster home due to the fact there were four children already in that household.

As to K.Z., social worker Katlynn Harris reported that over the past several weeks, mother had not been attending family therapy sessions with him. K.Z. was still in individual therapy and skills coaching, still taking psychotropic medication, and was recently referred for a psychological evaluation for purposes of adoption. Harris had received the case at the end of July 2014, at which time mother was not visiting the children because no social worker was assigned to her case. Mother told Harris she wished to visit only one or two children at a time due to difficulty managing all of the children at once, but Harris explained this was not possible because she needed to assess mother's relationship with the children. Of eight scheduled visits in August and September 2014, mother cancelled twice, did not show up once, and was one hour late for another. At the first visit, Harris observed the children were happy to see mother and

gave her hugs, but mother had a difficult time asserting a parental role with them and managing all of their behaviors. She did not console or redirect when N.Z. began screaming and crying about a snack, and when mother said goodbye to the other children, she ignored N.Z., who continued to cry and scream. On three occasions in September, L.Z. refused to go to visits, telling Harris mother stressed her out by urging her to call more, or that she would rather do homework or practice her trombone. During one September visit, K.Z., G.Z. and N.Z. were happy to see mother, but appeared more interested in playing with their toys than engaging with her, and they deferred to Harris, the visitation monitor, or K.Z.'s CASA for help with games, the bathroom, or opening snacks. At the end of the visit, mother was unable to redirect the boys when they began physically hitting each other, screaming and chasing each other about a toy. The children ran out of the visitation center and into the parking lot before anyone was able to redirect them to their respective cars.

During another September 2014 visit, mother spent individual time with K.Z., G.Z. and N.Z. and appeared attuned to their needs and emotional cues, but at the end of the visit she was unable to redirect the boys when they started arguing and play fighting. In late September, G.Z. also declined to visit, but mother never arrived, disappointing and visibly upsetting K.Z., who was preparing to surprise mother with N.Z. N.Z. did not appear visibly upset at mother's absence, and had no problematic behaviors with her caregiver. Mother was an hour late to another September visit attended by K.Z., L.Z. and N.Z. G.Z. again declined to go. When mother did not arrive on time, L.Z. stated, "I knew it, I knew she wouldn't come," and neither L.Z. nor N.Z. appeared upset as they

18

prepared to leave. While Harris transported them to their placement, neither girl talked about mother, but were in positive moods about N.Z.'s upcoming birthday party and school. Mother visited with K.Z. for a half hour, but missed seeing the girls.

In late September 2014, Agency received a referral that L.Z. and N.Z. had engaged in inappropriate contact with each other; L.Z. told the reporting party that she had seen her parents engage in similar behavior. A safety plan was enforced, and the girls were counseled. Agency was investigating the matter.

On October 7, 2014, mother's referral to the visitation center was closed as she had either not showed or cancelled four scheduled visits, and as of October 28, 2014, mother had not contacted Harris to reschedule any visits. Though she had maintained fairly consistent phone contact with the children, they were easily distracted and mother would complain that they did not want to talk to her. During September and October 2014, mother only had one call per week with the children, and at times would talk to K.Z. about her case, telling him she was going to "get him back," leading K.Z.'s caregiver to redirect the conversation.

Harris reported that Agency remained concerned for the children's safety and wellbeing due to mother's inability to make necessary decisions to provide them with a safe, stable and risk-free home. All of the children had experienced a significant amount of trauma and emotional distress in the past three years as evidenced by their tantrums, defiance, inappropriate contact, anxiousness, behavioral regression, stress, physical aggression and, as to K.Z., suicidal ideation and self-harm. Both parents had disregarded the children's health and wellbeing, and neither had shown willingness and ability to put

19

their needs above their own. Mother was not capable of occupying a parental role in the children's lives even though she was working and no longer involved with father or Michael C.; she had a history of not maintaining stable housing and employment and throughout had relied on violent, controlling men to provide for her. This seriously impaired mother's ability to supervise, protect, and care for the children and increased the risk of future neglect and potential physical and emotional harm to them. Mother also admitted she was not capable of providing for all of the children's needs at the same time, which was evident in visitation in which she appeared overwhelmed and struggled to meet each of their physical and emotional needs. The children did not look to mother to have their daily or emotional needs met, and thus, Harris concluded the parent-child relationship was not so significant that it would outweigh the children's overall safety or the benefits of adoption. Agency sought a continuance to further assess the sibling exception, adoptability and the best permanent placement for all of the children.

In a January 2015 addendum report, social worker Harris recommended that the juvenile court terminate parental rights and order a permanent plan of adoption for L.Z., G.Z. and N.Z., and that the court grant a 60-day continuance to assess the most appropriate permanent plan for K.Z. Four additional visits with mother occurred in November and December 2014, with L.Z. and G.Z. refusing to attend two of the visits. Mother's phone contact was inconsistent and she sometimes would not call for weeks at a time. L.Z., G.Z. and N.Z.'s caregiver reported that they did not ask to call their mother, and though K.Z. sometimes attempted to call her, her number was not in service. As of January 2015, mother did not have a phone by which she could be reached consistently.

20

Harris reported that at the November 2014 visit, N.Z. was excited to see her mother and gave her a hug, but told mother in response to questions that she liked living at her home. Mother gave K.Z. and N.Z. snacks and played games appropriately. At the first December 2014 visit with all of the children, the younger children were upset and agitated on the way there, and when L.Z. saw mother, she began to cry and said, "This is why I don't like to come because it makes me sad," telling Harris that she was sad "because she won't take care of us." Mother spent time with each child appropriately, but they were largely unresponsive to mother's prompts and needed redirection from Harris and the visitation monitor. Ignoring Harris's and the therapist's recommendations, mother insisted at the end of the visit on heating up food rather than spending time with the children. When L.Z., G.Z. and N.Z. arrived to the caregiver's home they hugged and kissed them, calling them mom and dad. Mother spent the same one-on-one time with each child at the second December visit, but did not engage any of them in conversation about their wellbeing, school or activities. She was unable to redirect the boys when they roughhoused, and unable to gain their attention for clean up or when they ran around the parking lot.

Mother's last December 2014 visit was just with N.Z., as K.Z. was out of town with his caregivers. On the way there, N.Z. told Harris she did not think mother was going to come, but would not say why. Mother and N.Z. played appropriately with N.Z. directing all of the play. N.Z. told her mother in response to questions that she liked living with her caregivers. While Harris and N.Z. transported mother to the trolley station, N.Z. told her she was going to change her last name to her caregiver's name after

21

she was adopted; that she was not going to be a "Z." Mother suggested she could keep Z. as part of her name, but N.Z. did not respond.

Harris observed that mother had not occupied a parental role in the younger children's life for almost two years, and as to K.Z., for over 36 months. She reported that all of the children were generally adoptable, and deserved the opportunity to grow up in a safe, stable and nurturing environment with parental figures that placed their needs first. L.Z., G.Z. and N.Z. were also considered specifically adoptable as they continued to thrive in their caregivers' home and at school as their daily emotional and physical needs were met, and it was important that they enjoy the stability and strong relationship with their caregivers for their future medical, developmental, and mental health. Though L.Z. worried about mother being alone, she told Harris that she preferred adoption because she was ready for "this to be over" and did not want mother and father to make it longer: "[D]on't they know the longer we wait, the harder it is for me[?]" L.Z. told Harris that her caregivers said they would maintain a relationship between L.Z. and mother. Harris reported that the caregivers had moved to a larger home, enrolled the children in extracurricular activities, and were capable, motivated and willing to provide the children with a safe and permanent home. They were committed to maintaining contact between the children and K.Z. throughout their lives.

At the January 2015 hearing, mother requested and the juvenile court authorized a bonding study and directed Agency make the children available. The children's counsel advised the court that all of them were in agreement with adoption.

In February 2015, Harris reported she observed one additional supervised visit with mother and K.Z., G.Z. and N.Z. in January 2015. Mother did not appear for another scheduled visit in late January, and Agency cancelled a February 2015 visit because mother had not contacted Harris. L.Z. did not want to attend the January 2015 visit because it made her sad. At that visit, mother asked Harris why L.Z. was not there and Harris had to remind her that it was not an appropriate time to discuss it in the other children's presence. Mother was more assertive and gave successful time outs to K.Z. and G.Z. when they behaved inappropriately, but when mother attempted to tell N.Z. she could not have candy, N.Z. had a tantrum and told mother, "You are not my mom anymore." When mother tried to redirect her, N.Z. stated she was not coming to visits anymore. After K.Z. distracted N.Z. and mother returned to check on her, she told mother she hated her and was never coming to another visit. N.Z. did not say goodbye to mother.

Before the next visit, N.Z. refused to attend. When mother failed to show up, G.Z. said, "I knew she wasn't going to show up . . . I just knew it." G.Z.'s caregiver reported to Harris that he had been having a tough time and was engaging in negative behaviors since mother's missed visit. Harris attempted to contact mother by phone on two occasions about subsequent visits, but was only able to leave messages. Mother did not contact Harris prior to the next scheduled visitation.

N.Z. and mother had two supervised visits in mid-February and early March 2015. L.Z., G.Z. and K.Z. refused to attend, K.Z. stating he would rather play basketball. Mother brought cards, snacks and coloring books for the children, and played

23

appropriately with N.Z., who enjoyed the one-on-one attention. N.Z. easily separated from mother and was not in emotional distress on the way to her caregiver, and N.Z. greeted her caregiver by saying, "Hi mommy . . . look," showing the items mother had provided. N.Z. easily transitioned to the family 's routine. At the March 2015 visit, N.Z. talked about being the "only kid" there, and that she would get all the toys and snacks. She appeared more interested in the snacks, and ignored mother or said she did not want to do what mother suggested. N.Z. said goodbye without incident and eagerly greeted her caregiver, easily transitioning to the household routine.

*March 2015 Section 366.26 Hearing*

At the section 366.26 hearing, the juvenile court considered stipulated testimony from K.Z., and accepted Agency's and the CASA reports.[4] K.Z.'s testimony was that he would be both happy and sad; but he would choose mother, adoption or placement with his grandparents. K.Z. stated he wanted overnight visits with mother when he was adopted. Agency presented social worker Harris as a witness. As to K.Z., Harris testified there were five families in San Diego County willing to adopt a child matching his characteristics. She felt adoption would benefit him as he had been involved with child welfare for over six years, and he deserved to be in a home with parental caregivers who

---

4       Specifically, those were Agency's and the CASA July 1, 2014 and October 28, 2014 section 366.26 reports, Agency's October 28, 2014 addendum reports, Agency's addendum reports of January 14, 2015, February 24, 2015, and March 12, 2015, the CASA January 14, 2015 reports as to K.Z. and the other children. Later in the hearing, the court admitted earlier reports at mother's counsel's request, stating it would consider those portions relevant to the parent-child bond, sibling bond or adoptability. Father submitted on the Agency's reports.

would provide for him on a daily basis and consistently meet his needs. He had been in his home for over a year, had not tried to harm himself or engage in unsafe behaviors there, and was doing well in school. She felt that with adoption, K.Z. would continue to thrive.

As for L.Z., G.Z. and N.Z. who were placed together in the same home, Harris recommended adoption. N.Z. and G.Z. were experiencing the benefits that come with stability and permanency, N.Z. in particular was showing positive behaviors and adjustments, and adoption would avoid her being in foster care for the next 12 years of her life. G.Z. was showing a more secure attachment in his home, looking to his caregivers and relying on them to provide for him. As for L.Z., she told Harris she wanted to move forward in life and wanted to be adopted. She also was having secure attachments with her caregivers and positive adjustments in the home, relying on them to provide her daily emotional and psychological needs.

Describing mother's visits as "friendly," Harris testified that as to all four children, the benefits of adoption outweighed any harm they might possibly suffer from severing their relationship with mother. According to Harris, mother did not provide a parental role in the children's lives and had not done so since they had come into custody.

Mother testified about her relationship with the children, describing her visits with L.Z. as positive and stating they had a special relationship. She described her relationship with K.Z. as "really close" and claimed he trusted her and remembered when they lived together. She described her relationship with G.Z. as close, but suggested she was not close with the children lately, as they did not want to see her and would rather go

25

on vacations or play. Mother claimed she missed visits due to work. She said N.Z. was excited to show her things and always gave her hugs, and both she and G.Z. cried when she missed visits. Mother did not submit a bonding study.

The juvenile court found by clear and convincing evidence that it was likely each child would be adopted if parental rights were terminated, that adoption was in the children's best interest, and the parents had not met their burden of showing any exception to adoption. It terminated parental rights and referred the matter to agency for adoptive placement. It found mother had demonstrated a pattern of visiting, but that there had been significant gaps reflected in the evidence, showing only eight visits since mid-July 2014 to January 2015, and thus it could not find consistent and regular visitation. It found very little evidence to show the quality of mother's relationship with the children was so deep and important that they would be harmed by severing it. The juvenile court found it was not enough that mother and the children loved each other; mother was not able to expand her visits beyond supervised visits, and violated the court's order by seeing Michael C. when she had unsupervised visits, thereby putting roadblocks in her ability to deepen her relationship with the children. It stated there was an absence of evidence of great harm if parental rights were terminated, combined with the children's comments indicating they were seeking permanence.

## DISCUSSION

### I. *Legal Standards/Appellate Standard of Review*

This court recently summarized the relevant legal principles, including the applicable standard of review, in *In re Anthony B.* (2015) 239 Cal.App.4th 389: "At a

26

section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption. [Citations.] 'If the dependent child is adoptable, there is strong preference for adoption over the alternative permanency plans.' [Citations.] In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. [Citations.] The court, 'in *exceptional circumstances*,' may 'choose an option other than the norm, which remains adoption.' [Citation.] The parental benefit exception applies when there is a compelling reason that the termination of parental rights would be detrimental to the child. This exception can only be found when the parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Anthony B.*, at p. 395.)

The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists"].) There must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, at p. 529

27

[observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a *parental* relationship is necessary' "].)

Mother suggests that we should review trial court's order only for substantial evidence, but we agree with Agency that the appropriate review standard is mixed:  "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child."  (*In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.)  The latter determination is " ' "quintessentially" discretionary" ' " as it " ' "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ." ' "  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)  Thus, we will not disturb that decision unless the court has " ' "exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." '  [Citations.]  . . .  'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

28

II. *The Juvenile Court Did Not Err in Finding Mother Failed to Establish the Beneficial Parent-Child Relationship Exception*

A. *There is Substantial Evidence Mother Did Not Engage in Regular and Consistent Visitation*

Mother contends she visited the children regularly "most" of the case and called frequently, and her missed visits were minimal when compared to her overall pattern of visitation. Mother seeks to establish her contacts with the children by pointing to the time period beginning in October 2011, when the children were still living with her, and she claims since January 2012, when K.Z. was detained at Polinsky and since March 2013 when L.Z., G.Z. and N.Z. were removed from her care, she visited the children consistently. As to K.Z., mother points out she engaged in conjoint therapy as well as overnight visits with him; she states his removal from her custody "did not weaken [K.Z.'s] desire to return to her care or her commitment to him." As to the other children, mother points to evidence favorable to her: her participation in services, her periods of regular visitation where she brought appropriate food and snacks, her Saturday visits, and the fact that the children expressed that they wanted to live with her in October 2013.

As mother acknowledges, on appeal her burden is to show the record lacks evidence of a sufficiently substantial nature to support the juvenile court's finding or order that she did not engage in regular and consistent visitation. (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 595.) Indeed, in conducting this inquiry, this court " 'accept[s] the evidence most favorable to the order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' "

(*Ibid*., quoting *In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)  Mother's analysis disregards this standard of review.

In fact, mother's visitation during many periods of time, particularly after K.Z.'s hospitalization and in 2014 and 2015, can only be described as inconsistent and sporadic. As Agency reported, in mid June 2013, mother was "not very proactive or consistent" in visiting K.Z.  Though mother made some progress in her services and was visiting K.Z. regularly in early 2014, including with unsupervised overnight visits, mother then resumed contact with Michael C. in March 2014 and Agency reduced her visitation with all of the children to supervised visits.  Thereafter, mother's visits suffered greatly.  As we have summarized more fully above, K.Z.'s CASA reported that Mother did not visit K.Z. between April 2014 and July 2014, but only saw him at weekly therapy sessions. About that time, mother's weekday visits with L.Z., G.Z. and N.Z. were cancelled after she missed most of them.  Mother missed three of eight visits scheduled in August and September 2014, with L.Z. refusing to attend three and G.Z. refusing to attend two September visits.  Mother stopped even her therapy with K.Z. as of October 2014, her referral to the visitation center was closed due to cancellations, and she admitted to social worker Harris she was unable to provide for all of the children's needs together at visits. Mother had not scheduled any new visits as of late October 2014.

Social worker Harris described mother's phone contact with the children in November and December 2014 as inconsistent, with mother sometimes not calling for weeks at a time.  In January and February 2015, mother saw K.Z., G.Z. and N.Z. once; she missed another scheduled visit and when she failed to respond to Agency's attempts

30

to contact her, it cancelled a third February 2015 visit. Mother gave her work as an excuse as for not visiting the children regularly, but she ignores the fact she was unable to care for all of them during visits and was not in phone contact with Agency.

It is evident that mother was unable to sustain unsupervised visitation with the children due to her insistence in maintaining inappropriate relationships, and was significantly hampered in her ability to keep a regular visitation schedule. She simply did not engage in significant or consistent visitation and contact over the last year of the children's lives leading up to the section 366.26 hearing. Substantial evidence thus supports the juvenile court's finding that mother had not "maintained regular visitation and contact" with the children (§ 366.26, subd. (c)(1)(B)(i)) and thus did not meet her burden to satisfy the first prong of the beneficial parent-child relationship exception to termination of parental rights. (*Ibid.*; see *In re C.F.*, *supra*, 193 Cal.App.4th at p. 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].) Mother's failure to meet the first prong of the beneficial relationship exception permits us affirm the court's order without further analysis.

III. *The Juvenile Court Did Not Abuse its Discretion in Finding the Absence of the Requisite Parental Role with Significant Positive Emotional Attachments*

We further conclude the juvenile court did not abuse its discretion in concluding the second prong of the beneficial parent-child relationship exception was unmet. Mother's burden was to establish that her relationship with the children " 'promotes [their] well-being . . . to such a degree as to outweigh the well-being [they] would gain in a

31

permanent home with new, adoptive parents.' " (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

In arguing she presented evidence of such a relationship, mother repeats her claim that she consistently visited the children, which we have addressed and rejected above. She also maintains she lived with the children during their "formative years"; she asserts they loved her and for "most of the case" wanted to return home. Mother attempts to distinguish cases including *In re Autumn H.*, *supra*, 27 Cal.App.4th 567, *In re C.F.*, *supra*, 193 Cal.App.4th 549, or *In re Casey D.*, *supra*, 70 Cal.App.4th 38, and compare her circumstances to *In re S.B.* (2008) 164 Cal.App.4th 289. She argues she was "more than a 'friendly visitor,' " had learned to set limits and be more assertive in her parenting, played with the children, and "never discussed her own problems." She maintains she "satisfied all of her children's needs when they were together" and the children "were never uncomfortable with her."

Mother's circumstances are unlike those in *In re S.B.*, *supra*, 164 Cal.App.4th 289. There, the court held the exception applied where the parent had complied with " 'every aspect' " of his case plan, maintained regular contact and visitation with his child, was sensitive to the child's needs, and voluntarily continued his efforts to remedy the underlying protective issues. (*Id*. at pp. 300-301.) A bonding study described the bond between the parent and child as " 'fairly strong' or 'moderate.' " (*Id*. at p. 295.) The psychologist who had conducted the study testified there was a potential for harm to S.B. were she to lose the parent-child relationship. (*Id*. at p. 296.) Here, mother did not demonstrate a full measure of commitment to the children by completing her case plan,

32

engaging in regular visitation, or diminishing the risk of harm by avoiding damaging relationships.

And mother's latter arguments are flatly contradicted by social worker Harris's testimony, mother's own admissions concerning her inability to handle all of the children at visits, and the evidence of L.Z. and G.Z.'s repeated refusals to engage in visitation with mother due to the stress of seeing her. We conclude that the record does not reflect mother and the children had a substantial positive emotional attachment or the requisite parental bond, such that severing the natural parent-child relationship would greatly harm them. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother cites no evidence that the termination of her relationship with K.Z., L.Z., G.Z. and N.Z. would be detrimental to them or that her relationship with them conferred benefits more significant than the permanency and stability offered by adoption. All of the children easily separated from mother at the conclusion of visits, and there is no bonding study or other evidence to counter Agency's conclusion that the children would not experience "great harm" from termination of parental rights. (Accord, *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 533-534; *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)

The evidence from social worker Harris was that the children were thriving in their placements, looked to their caregivers for primary comfort and care, and as to the younger children, called them "mom" and "dad." Agency reported the children were doing well in the caregivers' homes, and the caregivers were committed to adopting them and were meeting all of their emotional, developmental and educational needs. The

33

children have a compelling right to a stable, permanent home with a fully committed caregiver. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

We recognize that K.Z. was ambivalent about adoption, and desired overnight visits with mother even after adoption. But mother admitted as early as January 2012, that she was unable to provide for K.Z.'s special needs, and in January 2014 she likewise stated K.Z. needed help with his behaviors before returning to her care, indicating she was still unable to meet those needs. And mother and K.Z.'s joint therapist reported K.Z. felt he did not trust her to meet his needs and mother was unsure if she could care for him as well as the other children. Even if we were to assume there was evidence that mother and the children had a parent-child bond, mother did not establish further that they would be greatly harmed (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) by terminating her parental rights. (See *In re L.S.*, *supra*, 230 Cal.App.4th at p. 1200 [to avoid termination of parental rights it is not enough to show existence of a parent-child bond; the quality of the bond must favor continued contact].) She ignores the evidence that despite reunification services provided to her, she could not fulfill her parenting role with the children, particularly with K.Z., who had special emotional and psychological needs. And, as to all of the children, Mother made a decision to see Michael C., a man who committed an act of domestic violence against her, which showed her poor choices and judgment as well as her inability to stay away from unsafe associations. As a result, mother's visits with the children reverted to supervised visits and she was never able to progress beyond those. (Accord, *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) The evidence fell short of establishing that

34

mother's relationship with the children promoted their well-being to such an extent that it outweighed the well-being the children would gain in a permanent home with adoptive parents. (*In re G.B.*, at p. 1166.)

The juvenile court was entitled to credit the assessments and conclusions of the social workers and the CASA's. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.) We cannot say on this record that the juvenile court erred in concluding that no beneficial relationship existed such that termination of mother's parental rights would be detrimental to K.Z., L.Z., G.Z. and N.Z.

## DISPOSITION

The orders are affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

McINTYRE, J.